Morning your honor, Scott Tedman representing appellant Mr. Bowman. In this appeal we have six issues that are presented for the court's review. Three arise out of the actual trial itself and three arise as it relates to sentencing. I want to start initially with the evidence at trial that related to the company capital preservation fund or the CPF evidence. The government introduced that evidence on the basis, to the trial court at least, that it was inextricably intertwined with Mr. Bowman's company, the Kenfield Group, which I'll refer to as TKG. The position that I take at this point, your honor, although the trial court did not receive any opposition from the defense counsel at the time, it was simply submitted, is that the information and the company, TKG, was not inextricably intertwined with CPF and the court was not given adequate information to make that ruling. As I pointed out in my brief, there were significant differences between CPF and TKG in this operation. First of all, CPF was a securities-based investment company, whereas TKG involved the sale of notes. Secondly, CPF did not engage itself in requiring performance bonds and that was a huge issue in the trial of this case. The government's theory of the case was that Mr. Bowman sold these notes and represented to the note holders that the notes were reinsured by Lloyds of London. There was no evidence presented at the motion hearing and none was presented at trial by way of a document that Lloyds of London was involved with the CPF program. I think that's a huge point that the court did not decipher before allowing the CPF evidence to come to trial. What kind of review do we apply here? Is this plain error? It's plain error, Your Honor, because there was no objection. Well, that's a pretty high standard to get. Well, it is. And I think the court, the trial court, should have inquired further as to the true relationship between CPF and TKG. Well, you've got two schemes. Correct. They have a lot of common elements. I mean, they use the bonds, they're... Your Honor, see, I think that's a little bit of a misnomer from the record. I'm trying to get to the point that there's no objection. What is there that's going to alert the court without objection that there is a problem here? Well, I think the first thing is the court needs to, in terms of reviewing the two companies, make a base determination as to what the primary function of those two companies were. And I don't think that was done by the government's proffer. That's the first thing. That should have alerted the court to a problem. The second thing is the court knew in the trial brief of the government that the essential elements of all 17 counts that Mr. Bone went to trial on related to an alleged misrepresentation that Lloyds of London was a reinsurer of the TKG bonds. In its proffer to the court relating to CPF, there was no documentation given to the court whatsoever relating to Lloyds of London reinsuring or issuing performance bonds for CPF. And that's clearly the reason the government wanted that evidence in. Clearly. And I think that's an issue that was raised. That's retrospect. You know, but I'm just sort of curious. The trial judge is sitting there and this evidence is offered and there's no objection. And now we have an argument that the trial court should have really done what the defense lawyer should have done in asking questions about this and getting into details that perhaps, you know, for all the trial court knows, the defendant doesn't want to come in. Well, I can't disagree with the court's comments in that regard. And the trial counsel's performance. What is your strongest case here that where there's no objection to this kind of evidence that the court has an independent burden to explore this? I think the court, as the arbiter between the parties as to what evidence is going to come in. And in this particular situation, when the court understands the critical nature of this reinsurance issue, my position is it behooves the court to flush out the very specific details if the government wants to come in with other act evidence. I think that's critical. Isn't that what we rely on counsel to help the court to do? Yes. I agree. To a large extent. But I think in this case, Your Honor, the court was given that issue. It was flagged. And my position is that was not adequately addressed. And the other part of the analysis is, the government says it's inextricably intertwined, so it's not 404B. Whether it's 404B or being inextricably intertwined, there is no question that even if the trial court gets past that analysis under 403, there was a clear danger of prejudice here as it related to the CPF-related evidence that came in. Because the government's, the way they tried the case was, and the way they prosecuted it through their witnesses was that Mr. Bowman started at point A with CPF, and he continued with the course of conduct through TKG. And that was their theory. And the court knew that at the time. So even if the trial court felt that it was either inextricably intertwined or that it wasn't but that it was 404B, a 403 analysis should have kept this evidence out. Because the danger of prejudice was very high as it related to Mr. Bowman in terms of the charges he was actually confronting, which was TKG only, not CP, excuse me, not CPF. I think that's a critical factor. With regard to the second issue that was raised at trial, or came out of the trial, was Mr. Bowman's denial by the trial court to present FCCA reinsurance after May 25th of 1998. And fundamentally, Your Honor, I think that this is a fact-based inquiry, and I think it's important to note, and I would refer the court to excerpt of record, appellant's excerpt of record six, which is the TKG letter of May 25th, 1998. I'm talking about the exclusion? I'm sorry? We're talking about the exclusion of the evidence? Yes, the exclusion of the evidence that the defense wanted to put in that Mr. Bowman had secured reinsurance after being notified that Lloyds was not reinsuring the bonds through a company called Finance Corporation of America. I've got a question on what your view is in terms of the relevance of that, given the fact that the fraud had already occurred. Well, I think it's relevant because it goes directly to Mr. Bowman's state of mind, and I don't agree that the fraud had already occurred. I dispute that with the government's position. And the reason I say that is this. Mr. Bowman started this company, and approximately a year and a half to two years later, he is notified that Lloyds of London is not reinsuring his bonds. He receives a telephone call. Initially, he didn't believe it. He received a letter about a month later from an Andrew Rag from Lloyds of London, purportedly, indicating that the reinsurance was not there. Between all of that, Mr. Bowman had been in touch and had secured the reinsurance, as far as he knew, from Richard Vucinic, from Berkston Insurance down in Florida. Once Mr. Bowman found out there was a problem, he began to take steps to check into it. On May 1st, the federal government, through the Eastern District of California's U.S. Attorney's Office, indicted Mr. Bowman, May 1st of 1998. On May 25th, and just as a point of clarity, obviously the May 25th letter, which I think accumulated 15 additional counts, hadn't happened at that time. After Mr. Bowman's indicted on May 25th, he writes a letter to the note holders. And the very end of that letter indicates, specifically, that Kent Field is doing everything possible to get the necessary questions answered concerning the reinsurance, while at the same time continuing our work with the companies in which we have invested. Mr. Bowman, the government's position is the fraud had ended at that point, and they want to draw a line in the sand because they don't want Mr. Bowman to talk to the jury about anything else that happened in terms of his good faith efforts to secure the principal investment of the note holders. And so I think when the court cuts off Mr. Bowman's ability to show that he spent over $200,000 securing a new policy of reinsurance through FCCA, denies him the argument and the right that he did not have any specific intent, he didn't have any intent to defraud anybody. And furthermore, it tied in with his lack of ability to purport his good faith defense, because his defense at trial was that I relied on Mr. Vucinic. He told me we had a bond. We paid him over $400,000 for that bond, and I had no reasonable knowledge or basis to know that that reinsurance policy from Lloyds was not in existence. So I think it is probative on the issue of his state of mind that that policy of reinsurance through FCCA, which came about within a month, I believe it was in June of 98, the jury should have known that. And to not know that, I think, was error by the court. The third issue that was raised at the trial was the ñ came out of the trial is the jury instruction issue. And I think this may be, frankly, the most egregious error in the trial of all of them. Mr. Bowman's defense was that he relied in good faith on Mr. Vucinic. He paid the policy of insurance. He believed he had it. He found out it wasn't there. When the jury instructions were finalized, the court denied Mr. Bowman the good faith instruction, which was proposed, defendant's proposed instruction A. And he simply relied on all of the instructions that were put in as part of the general packet. And what's particularly troubling with regard to the language of the instructions that were given to the jury is the fact that, one, this is a specific intent crime, and this court will find no language whatsoever in any of those three instructions, and I believe they're instructions 16, 17, and 19, contained in Appellant's Excerpt of Record 17, that talk about specific intent. It simply says intent in every instance. And there is, in fact, the case law of the government cites Bonanno, Faust, Green, Duran. Every one of those Ninth Circuit cases talks about properly instructing the jury on a specific intent crime to state that to the jury. I guess I'm not understanding. Wasn't there or weren't there instructions on intent? There were instructions on intent, but there was not language that would give the jury an understanding that it's a specific intent crime. But you're not, you didn't raise an objection to that, right? On here or at the trial level? Either. To the lack of a specific intent instruction. Yeah, you're. Right? That's not an issue here, is it? You didn't raise it. It should have been a. Well, I think it's part of the issue, Your Honor. It's Mr. Bone. The issue that I presented to the court in the brief is that Mr. Bone was denied a good faith instruction. Right. Good faith goes to intent. Clearly, that's the defense. And so. Are you relying on a specific instruction? I have your defendant's proposed instructions here. Is that what you're talking about? What is precisely the error? Is it a rejection of your formulation or the inadequacy of the instructions as given? I think it's both. I think it's an error to deny Mr. Bowman the good faith instruction that was proposed. And as a part of that analysis, the instructions that were given to the jury were not adequate in terms of informing them of the proper showing of intent on behalf of Mr. Bowman to convict him. It's all part of the instructional error in the case. Well, it was it was the jury instructed that Bowman that the government has to prove that he made statements he knew to be false. That's what I said. That's my understanding. Well, the instruction says that he had to have the intent to defraud. Right. That's correct. Well, what you know, that's what you know, that's the statutory element. I mean, what more do you need to define the crime? And if he needs the intent to defraud, obviously, you know, you know, that embraces on the other side the good faith. If he didn't have the intent to defraud. Right. Your Honor, I don't think I don't think it does. I don't think it clearly spells out for the jury that if Mr. Bowman is to be convicted, the jury has to find that he has the specific mental state of mind to defraud somebody. And furthermore, clearly that instruction does not adequately address the issue of Mr. Bowman's good faith reliance on certain things he was told at the time he secured the lawyers. Were you could you argue that to the jury? I didn't try the case, Your Honor. That was. Well, you could have. I could have. His counsel is permitted to argue that. He was. And that's another point that's interesting. I raised in my brief. If he was permitted to argue that, the trial court allowed him to do that, but then denied him the good faith instruction, which seems completely inconsistent from my perspective. But don't our own cases say you don't have to use the words specific intent? That is not mandatory. It's not mandatory language, Your Honor. Yes, it says that. But, you know, in looking in looking at, you know, some of the cases that were cited, I mean, there's general intent and specific intent crimes. And my position is that with regard to the instructions that were given to this jury, it did not adequately cover that particular issue. I understand your position. Do you want to tell us briefly about the sentencing issues? Yes. With regard to the sentencing issues, as it relates to the actual intended loss calculations, my basic position is this, Your Honor. With regard to the TKG losses, the evidence was clearly developed at the sentencing hearing that as of the point where Mr. Bowen was released, relinquished of his ability to run TKG, nobody had lost any money. Every interest payment had been made, and no principal had been lost. John Richardson was put in by the Santa Cruz, through the Santa Cruz County District Attorney's Office, as the interim manager. He then made the decisions as to what was going to happen, whether reinsurance premiums were going to be paid, whether the FCC insurance was going to continue, which it did, and it failed because he didn't make the interest payments to the note holders, and the program collapsed. And the case I cite is U.S. v. Hicks, and I understand that the Hicks case talked about criminal conduct. That's what it talked about. But I think the principle applies here in the sense that when Mr. Bowen was not allowed to make decisions for TKG, as of June of 1998, and nobody had lost any money up to that point, and an independent party or agency takes over that company, and that's where the losses occur, I don't think those losses should be attributable to Mr. Bowen, pursuant to Hicks taking that principle and applying it to this case. Even when it's a Ponzi scheme. It's doomed to, well, fall down. That's the government's, that was the government's position. Mr. Bowen's position of trial was not a Ponzi scheme at all. And in point of fact, the notes that were due three years later were secured by FAA notes, security interest notes with Northeast Air. I mean, there was a lot of equity value in the companies he'd invested in. So I wouldn't agree necessarily that it's a Ponzi scheme. With regard to the TKG, to the CPF-related losses. But doesn't the verdict tell us something? Well, yeah, the verdict tells you that, you know, the juries believe the government. Now, but I don't think necessarily, Your Honor, that means by definition. I don't see how you can argue that it's not a Ponzi scheme after he's been convicted on, what, 15 counts? Well, he's convicted of 15 counts of mail fraud. That's what he's convicted of. It does not necessarily follow that it's a Ponzi scheme by definition because of the conviction. I wouldn't agree with that. All right. Now, with regard to the CPF-related losses, I've already covered that with regard to the lack of a nexus between CPF and TKG, and I think the Court should not have counted that towards Mr. Bowman's sentence as it relates to his offense level. And then very quickly, as it relates to Issue 5, the two-level enhancement for supervision of Richard Vucinic, I just want to point out that Mr. Vucinic in the trial testimony revealed that he assured Mr. Bowman the bond was in place, that Mr. Vucinic refused to put together a brochure-type product for Mr. Bowman, Mr. Bowman paid Vucinic $400,000 in premiums for the performance bond, Mr. Vucinic advised Mr. Bowman to use a domestic insurance carrier, and Mr. Bowman lacked any factual knowledge that Vucinic had not secured the reinsurance through Lloyds. There is no evidence in this case at all that indicates that Mr. Bowman was directing the activities of Richard Vucinic. That is simply a government theory. The evidence does not support that in the trial record. And finally, as to Issue 6, regarding the two-point enhancement for Mr. Bowman abusing a position of trust, my position there is that threefold. One, during the time in which the note-holder money was received by TKG, it was a viable operational company. Two, Mr. Bowman invested several million dollars in ongoing startup capital companies and did not abuse any position of trust because he did what he said he was going to do with the money. And thirdly, the note-holders received what they contracted for. They received every interest payment timely all the way through until Mr. Bowman was released of his ability to run his company. Thank you. Good morning, Your Honors. May it please the Court. I'm Doug Sprague, and I was from the Eastern District of California, U.S. Attorney's Office. I was co-counsel at trial in this matter. You don't have to feel obligated to use all of your time. Oh, okay.      I was a co-counsel at trial. I was a co-counsel at trial. I'd just like to correct one thing that Mr. Tedman said. He said it twice, that there was no evidence before the trial court that Lloyds of London had been used with respect to the CPF, Capital Preservation Fund. It had been used. It's in my trial brief at page 16 that Mr. Bowman represented to investors in CPF that Lloyds of London backed those bonds, which had the same interest rate guarantees. With respect to Financial Capital Company of America, the FCCA, I think this issue will be very brief, but it presents me a segue to the good faith issue and also an overarching issue in the case. Here is a defendant who is saying that he was prejudiced by the inability to put in evidence that after his fraud was discovered, after his Ponzi scheme was shut down, that he tried to go out and find a replacement guarantee for his Kentfield Group program, a program which had no profits, no legitimate investments, where the principal spent more than a million dollars of investor money on a house, on renovating a house, on renting another house while he did that, and on buying luxury cars and ski trips and shopping sprees. The notion that anyone is going to insure or reinsure that program is extraordinarily difficult to believe, and that underlies the Capital Preservation Fund. It underlies the Kentfield Group. It underlies his effort to put in evidence about the Financial Company of America, and it underlies his good faith argument that his whole program could ever be insured by anyone or reinsured by Lloyds of London when those were the parameters of his program, his investment program. Turning to the good faith issue, the elements of mail fraud were clearly spelled out for the jury. It's in the jury instructions. It's in the record excerpts. False promise, the defendant knew it was false. He intended to defraud, and the intent to defraud means an intent to deceive or cheat. As this circuit's case law is held, as in Faust and Green, there is no way those instructions preclude the possibility that a jury could think a defendant was acting in good faith but still convict him. Also, another issue on the defendant's proposed jury instruction, it was very confusing and it was inaccurate, which was an alternative grounds that the district court used to refuse to give that instruction. With respect to the loss amount, Mr. Tenman said that it was not a Ponzi scheme, and he said, look what the defendant did with the money and look at the investments. The investments he made were to a trim along company where his colleague and friend got 5% commission kickback, $80,000. They gave an unsecured loan, undocumented loan to another friend of his. The peace missile was Russian and American missiles used to make golf clubs. These are all start-up companies that he's investing in purportedly while telling the investors that it's conservative, everything is secured. As to leadership, there is plenty of information in the record how he directed Vucenic. He would, Mr. Bowman would FedEx materials to Mr. Vucenic, there would be bonds. The instructions were just sign them and return them to me. He certainly directed Vucenic as well as directed his promoters. And with respect to abusive position of trust, he had a position of trust, he doesn't argue that, and he just argues his guilt or innocence on the issue of whether he abused it, and I think that the jury's verdict is clear on that. Thank you. I don't care. You have about a minute if you want to use it. Pardon? You have about a minute for rebuttal if you wish to use it. All I can say, Your Honor, is that with regard to Mr. Sprague's comments that TKG did not invest in viable companies and that essentially it was just a set-up, fraud is not the case, as indicated in the brief, there were very specific and identifiable companies. Northeast Airlines had routes on the East Coast that were ready to go. So the allegation that Mr. Bohm was simply paying money to his cronies is not the case. As it relates to the management and supervision of Mr. Vucenic, the government points out that, well, he FedExed documents to him and he told him to send them back. That's not management, that's just business in the ordinary scope and course of what everybody does. The fact of the matter is Mr. Vucenic was an independent person that Mr. Bohm did business with and he didn't direct his activities at all. Thank you. Thank you, Captain.
judges: Schroeder, O'scannlain, Tashima